**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **TRACY COHEN,** | ) | |
| | ) | **No. 1:24-cv-569** |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **KERING, GUCCI,** | ) | |
| **GUCCI AMERICA, INC., and** | ) | |
| **GUCCI NORTH AMERICAN** | ) | |
| **HOLDINGS,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

## COMPLAINT

Comes now Plaintiff TRACY COHEN, and files this Complaint against Defendants KERING, GUCCI, GUCCI AMERICA INC, and GUCCI NORTH AMERICAN HOLDINGS, and alleges the following:

### INTRODUCTION

1.       Kering proclaims itself to be the "world's most influential luxury group." It claims, "Women not only form an important part of our customer base and teams, but they also play a decisive role along the entire value chain. The Group is particularly committed to gender equality and to the development of talented women in all its entities and at all levels of the organization." **This is false.**

2.       Italian luxury brand Gucci is Kering's most profitable brand in its entire conglomerate. Gucci claims, "We have a zero-tolerance approach to any form of Modern Slavery. We believe that protecting the dignity and rights of all people is paramount to good business. It is within our core values to fight against exploitation and to strive toward eradication of forced, bonded, and slave labor throughout our supply chain" **This too, is false.**

3. **The Plaintiff here, Tracy Cohen, was arguably Gucci's top-performing salesperson throughout all of Gucci America. Before she was fired for pretextual reasons, in October 2023, Ms. Cohen sold nearly $50 Million in Gucci product over the course of her nearly 18 year-career.**

4. During Ms. Cohen's employment, rather than decorate her with recognition and give her opportunities to succeed, Gucci instead consumed nearly every second of her life, exploiting her though a modern-day slavery scheme of psychological abuse, manipulation, and discrimination where her employers - Gucci and Kering - destroyed her sense of self and made her live in a constant fear of losing her job.

5. Ms. Cohen has since learned that she is not alone. A 2021 National Institute of Justice study, "An Exploratory Study of Labor Trafficking Among U.S. Citizen Victims," found that, despite common belief, labor trafficking does occur for U.S. citizens, and 15% of the people surveyed responded that they worked in retail.[1]

6. As detailed more fully below, Ms. Cohen is not the first female employee to complain about Gucci's abusive and exploitative labor practices around the globe, including but not limited to: maintaining sweatshop conditions in China; forcing pregnant women to have abortions; ignoring complaints of sexual harassment; pushing new mothers out of their jobs; causing women to suffer from incontinence; calling women "crazy;" and even making female models wear straightjackets on the runway against their will.

7. Plaintiff joined Gucci Chicago in 2006, as a Sales Associate. After nearly 12 years of hard work, in 2018, Plaintiff earned the #1 salesperson position in the store, surpassing at least 20 other Sales Associates, month after month and year after year. Nearly each month, she was responsible

---

[1] An Exploratory Study of Labor Trafficking Among U.S. Citizen Victims, 2021

for selling approximately 15% of the Gucci Chicago store's entire monthly quota, despite the store having at least 20 employees on any given month.

8.     Upon Plaintiff earning the #1 position, Defendants created an elaborate scheme of trickery to push her to sell more Gucci product, while keeping her afraid of losing her job. Defendants controlled nearly all aspects of Plaintiff's life by isolating her from society, demanding she work off-the-clock while attached to her electronic selling devices, making negative comments about her age and mental health, and, giving her a monthly sales quota that was nearly two to three times the quota of her peers.

9.     As detailed more fully below, Defendants preyed on Plaintiff's depression and anxiety through fear, isolation, and control. Indeed, according to the National Disability Rights Network, "People with disabilities are more likely to experience human trafficking than their peers. Traffickers deliberately target victims they think they will be able to isolate and control."[2]

10.     Defendants physically and emotionally abused Plaintiff, lied to her, coerced and exploited her, all while unjustly enriching themselves. For example, for years, Gucci falsely promised her an assistant, as well as "rewards" like international travel and fashion shows, in an effort to push her to sell millions of dollars in Gucci product. In fact, a common labor trafficking trait is to lure victims by giving them hope of a better future. "Stories become weapons in the hands of human traffickers - tales of romantic love everlasting or about good jobs and fair wages just over the horizon."[3]

11.     Rather than keep their never-ending promise that help was on the way, Gucci instead pushed Plaintiff to reach exorbitant sales goals all alone from her at-home labor camp, while refusing

---

[2] National Disability Rights Network, "Human Trafficking: What It Is and How it Impacts the Disability Community," January 15, 2021
[3] National Human Trafficking Hotline Organization, "Recognizing the Signs"

to pay her for the hours she spent outside of store and off-the-clock. According to the Trafficking Victims Protection Act, victims are frequently forced to work unreasonable hours, which leaves them physically exhausted.[4]

12.    To keep Plaintiff both physically and psychologically weak, isolated, and compliant with their demands that she sell more than anyone else, Defendants intentionally excluded Plaintiff from prestigious opportunities and events, and made her feel guilty when she attempted to take time off.

13.    As she consistently performed at an elite level, Defendants rewarded less-tenured, younger, lower-selling Associates who did not suffer from depression and anxiety, by sending them to fashion shows in Milan, Los Angeles, and New York, as well as to awards shows like the Grammys and the Los Angeles County Museum of Art Awards (LACMA). When Plaintiff asked for metrics on how they decided who got to attend what events, Defendants ignored her.

14.    Management also personally benefited from the scheme, earning bonuses themselves from Plaintiff's sales that pushed the Gucci Chicago store to make its monthly goals. As recently as July 2023, management told her, "We made our bonus because of you," and then handed her, again, the highest quota in the store the following month.

15.    Defendants knew that Plaintiff was struggling to make her unrealistic sales goals. For years, Plaintiff begged to be treated equally and pleaded for help. She consistently stated that their abusive practices were causing her body to break down, and that she feared losing her job.

16.    Plaintiff's coworkers confided in her that they witnessed how Defendants were abusing her, but they never came to her aid. Instead, they watched her physically deteriorate. As just

---

[4] TVPA, *supra* note 4, 22 U.S.C. § 7101(b)(11)

one example, an under-40, male Associate told her, "Why don't you just quit," after watching her manager bully her.

17.     Defendants ignored her cries for help, called her "crazy," and sometimes, to scare her, wrote her up for petty violations that they did not write-up others for. Rather than fire her, they increased her monthly goal, tricking her into believing that if she sold more, she would eventually be treated equally, or even receive a breadcrumb of recognition.

18.     Defendants kept Plaintiff in a constant state of fear of losing her job if she did not make her constantly changing, exorbitant monthly sales quota. Plaintiff continued to work under exploitative conditions as her hair fell out, and as she visibly wasted away into skin and bones, suffering from physical manifestations of Defendants' disparate treatment of her.

19.     While holding the top performer position, she consistently told Defendants that she was suffering from exhaustion, anxiety, and depression, and that their conduct was making her disabilities worse.

20.     Plaintiff complained to both Gucci and Kering Human Resources (HR) that her managers bullied her. She even asked to be transferred to another store. Defendants refused, while transferring younger, non-disabled, less successful Associates to other locations.

21.     Finally, in September 2022, Plaintiff emailed then-Gucci President Marco Bizzarri, believing that the man-at-the-top, who even created a "values framework allegedly" devoted to women's rights and equality in the workplace, would take her complaints seriously, and finally help her.

22.     Instead, President Bizzarri ignored Plaintiff, the female employee who brought nearly $50M in revenue to Gucci and Kering, over her nearly 18-year career.

23. Realizing that she had nowhere to turn internally, in January 2023, Plaintiff finally got the courage to file a discrimination charge with the Equal Employment Opportunity Commission and Illinois Department of Human Rights, alleging age, gender (female), and disability discrimination.

24. By finally invoking her rights, Plaintiff signed her death warrant: Over the next nine-months, Defendants devised and executed a plan to intimidate her into quitting, or fire her if she refused. Indeed, according to results from a University of Massachusetts student, at least 63% of workers who filed an EEOC complaint eventually lost their job.[5]

25. First, in July 2023, Defendants suspended Plaintiff for the first time in her nearly 18-year history with Gucci to scare and disempower her. The "Warning" listed incidents that allegedly occurred nine months prior. Plaintiff then filed another complaint with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR"), alleging retaliation.

26. Plaintiff served her suspension, then returned to work, and continued to make her monthly goals, maintaining her #1 position in the store.

27. The following month, Defendants convinced Plaintiff to bring her clients into the store for a "customization event." Unbeknownst to Plaintiff, this was part of Defendants' scheme to get her to sell $80,000 of customized goods to her clients, to be delivered after they fired her.

28. Just weeks later, on October 4, 2023, Defendants terminated Plaintiff, for two incidents that allegedly occurred on September 3 and 4, 2023. They offered her no severance, effectively throwing her out onto the street after nearly two decades of relentless work.

---

[5] Donald Tomaskovic-Devey and Carly McCann, Who Files Discrimination Charges, Center for Employment Equity University of Massachusetts, Amherst

29.     After terminating Plaintiff, Defendants continued to unjustly enrich themselves: Rather than pay Plaintiff for her commissions-earned related to the $80,000 in special orders, they re-rang the orders, and gave her commissions to other Associates and Managers.

30.     Then, Gucci sent a holiday gift to Plaintiff's former clients in her name, asking them to scan a QR code to purchase Gucci gifts, even though she had not worked there for three months.

31.     Plaintiff complains pursuant to the Federal Trafficking Victims Protection Act (TVPA) of 2000, Pub. L. No. 106- 386; Illinois Trafficking Protections Victims Act, 740 ILCS 128; Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq; ADEA - Retaliation; Disability Discrimination ("ADA"); ADA - Hostile Work Environment; ADA - Retaliation; Illinois Human Rights Act ("IHRA") - Age, 775 ILCS 5/101 et seq.; IHRA - Disability; IHRA - Hostile Work Environment/Disability; IHRA - Retaliation/Age and Disability; Intentional Infliction of Emotional Distress ("IIED"); Breach of Contract; Unjust Enrichment *(in the alternative)*; Fair Labor Standards Act, ("FLSA") 1938 29 U.S.C. § 203; Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105/1 et seq.; and, Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

32.     On or about January 19, 2023, Plaintiff filed a charge of discrimination with the EEOC, alleging sex (female), age and disability discrimination, as well as retaliation. The charge was simultaneously cross-filed with the IDHR. Exhibit 1 On July 20, 2023, the Equal Employment Opportunity Commission ("EEOC") issued the Right to Sue for this charge. Exhibit 2 On November 15, 2023, the Illinois Department of Human Rights ("IDHR") issued a notice of opt-out and administrative closure for this charge. Exhibit 3

33.     On or about July 6, 2023, Plaintiff was suspended for the first time, in her nearly 18-year career. On or about July 25, 2023, Plaintiff filed a new charge of discrimination with the EEOC, alleging age and disability discrimination, and retaliation for filing the abovementioned discrimination

charge on or about January 19, 2023. The charge was simultaneously cross-filed with the IDHR. Exhibit 4

34.     On October 4, 2023, Gucci fired Plaintiff. As a result, on October 10, 2023, Plaintiff filed a new charge, alleging age discrimination and retaliation. Exhibit 5 On October 24, 2023, the EEOC issued a Right to Sue for this charge. Exhibit 6 On October 24, 2023, IDHR closure was requested for this charge and is still pending. Exhibit 7

35.     On December 11, 2023, Plaintiff filed an EEOC charge, naming Defendant Kering as her employer, and claiming sex, age, disability, and retaliation. Exhibit 8 Also on this date, Plaintiff filed an EEOC charge against Gucci America, Inc. d/b/a Gucci Chicago, to protect Plaintiff's sex and disability claims. Id.

36.     The continuing acts of employment discrimination referenced in Plaintiff's charges of discrimination were committed by all Defendants.

37.     This action is being commenced within ninety (90) days of Plaintiff receiving the Notice of Right to Sue, on October 24, 2023, for her charge, dated July 25, 2023: age and disability discrimination, and retaliation; in addition to her additional Notice of Right to Sue, dated October 24, 2023. Her subsequent retaliation charge, dated December 11, 2023, following her termination, remains open with the EEOC.

38.     Plaintiff has complied with all administrative prerequisites to bring this lawsuit.

39.     Plaintiff will seek leave to amend this Complaint to assert her claims against the parties. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

**PARTIES**

40.     Plaintiff Tracy Cohen is a resident of Cook County, Illinois, and, at all times relevant was an employee of Defendants, working both from her residence and from the Gucci Chicago store, until she was terminated on or about October 4, 2023.

41.     At all times relevant, Defendant Kering is a foreign for-profit corporation with offices headquartered at 150 Totowa Road, Wayne, New Jersey.

42.     At all times relevant, Defendant Gucci is a foreign for-profit corporation which sells luxury fashion and goods.

43.     At all times material, Defendant Gucci America, Inc. is a foreign for-profit corporation doing business within the jurisdiction, which is headquartered at 50 Hartz Way, Secaucus, New Jersey.

44.     At all times relevant, Gucci North American Holdings, Inc. is a foreign for-profit corporation with offices located at 195 Broadway, 12th Floor, New York, New York.

45.     The abovementioned institutional Gucci Defendants will collectively be referred to hereinafter as "Gucci."

## JURISDICTION AND VENUE

46.     This Court has Original Jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 as these claims involve Federal Questions under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 626 et seq, Americans with Disabilities Act (ADA), 29 U.S.C. §12101, and Fair Labor Standards Act (FLSA) 29 U.S.C. § 206.

47.     This Court has Supplemental Jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims (Counts II, VIII-XIV, XVI-XVII), which arise out of the same nucleus of operative facts giving rise to the federal law claims.

48.     This Court has Diversity Jurisdiction because: (i) the federal law claims arise under the statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the

federal law claims as to form the same case or controversy under Article III of the United States Constitution.

49. The Complaint alleges violations of the Federal Trafficking Victims Protections Act (TVPA), 18 U.S.C. § 1589 and this Court has exclusive jurisdiction over actions filed under the TVPA.

50. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district. Plaintiff was employed by and terminated by Defendants in this district.

51. Defendants are "employers" within the meaning of the ADEA, ADA, and IHRA.

## FACTUAL ALLEGATIONS

### I. DEFENDANTS' SUPPORT OF WORKING WOMEN IS A FACADE.

#### A. KERING NEVER PROVIDED PLAINTIFF WITH CAREER ADVANCEMENT, DESPITE ITS GUARANTEES.

52. The Kering conglomerate owns Gucci, an Italian luxury fashion brand, as well as other luxury fashion houses, including Balenciaga, Saint Laurent, Bottega Veneta, Alexander McQueen, and Brioni. In 2022, Kering employed over 47,000 employees and generated a revenue of € 20.35 billion.

53. Gucci is Kering's most profitable brand in its entire conglomerate. As of December 31, 2022, Gucci had 528 stores worldwide, and generated a global revenue of about € 10.5 billion.

54. Kering falsely holds itself out as a place for career advancement, as well as an ambassador for women's rights, stating:

> a) According to Kering's Code of Ethics, "We owe our colleagues and staff respect and fair treatment, and the **guarantee of a motivating work environment** which respects the dignity and rights of all individuals, fostering development and well-being. We will promote a human resources policy that contributes to professionalism, motivation and job satisfaction for all by **offering opportunities for training, mobility and internal promotion, and by developing the employability of each individual**."

> b) Additionally, according to its Code of Ethics, **"Kering does not tolerate any sort of harassment, discrimination, intimidation,**

bullying or humiliating behavior, whether psychological, sexual or constituting an abuse of power ... Harassment means any repetitive voluntary pattern of hostile, abusive or humiliating behavior, whether in the form of verbal comments, actions or gestures which jeopardize the dignity or psychological well-being of a person and which cause a deterioration of the working environment. It may take multiple forms (degrading, offensive or obscene comments, rumor or ridicule, threats, requests to perform demeaning tasks, excluding and isolating people, etc.);"

c) **A career at Kering is "the chance to grow within a talented and driven workforce in an environment that empowers imagination and values development and diversity;"**

d) According to Kering's own "Modern Slavery Statement," it is committed "to eliminating child labor and **prohibiting slavery, human trafficking, debt bondage and the use of forced or compulsory labor throughout the entire supply chain**;

e) "Our pledge to our people is clear: **foster an open, diverse and stimulating work environment** where employees are empowered to take risks, to be **inspired, to go further**;"

f) **"We provide rewarding opportunities for continuous professional growth, personal development and international mobility;"**

g) Kering "places the employee experience at the heart of the Human Resources strategy."

55. Kering's "codes," policies," ethics" are a facade. Kering never built a supportive and inclusive environment for Plaintiff; never rewarded her; never promoted her; never gave her opportunities for professional growth; and never invoked an "internal system" to guarantee she was not being exploited in her workplace.

## B. GUCCI USES PUBLIC CAMPAIGNS AND MISLEADING JOB POSTINGS TO COVER-UP ITS ABUSE OF FEMALE EMPLOYEES.

56. In alignment with Kering's disguise of being anti-slavery and pro-women, Gucci, too, engages in equally dishonest campaigns of convincing celebrities and everyday consumers alike that the brand supports women.

57. In Kering's job postings for Gucci roles, Gucci falsely claims to maintain a "purposeful environment **where your voice can be heard**, and your personality fully expressed: **We are more than a place to work: we are a joyful and open community where unique possibilities come to life. It's the playground where you can amplify your skills and explore territories you never thought possible."**

58. **Look no further than Plaintiff's complaint for the truth:** Not once, in her nearly 18-year career, was Plaintiff's voice heard, or was she given a "unique" possibility to "amplify her skills." Rather, she was required she slave away, selling Gucci product, off-the-clock and without pay to meet her unfair sales goals, or otherwise risk being fired.

### C. FEMALE GUCCI EMPLOYEES ACROSS THE WORLD HAVE COMPLAINED OF A PSYCHOLOGICALLY ABUSIVE AND HOSTILE WORK ENVIROMENT.

59. <u>Plaintiff is not the first female Gucci employee to complain about being abused, discriminated against, and forced to endure brutal working conditions</u>.

60. In fact, Gucci has documented a history of refusing to address its female employees' complaints, and then firing them when they complain:

a) In 2010, Gucci fired a female Handbag Buyer when she was 8-months pregnant due to "restructuring," then gave her job to her younger assistant. At the same time, Gucci also demoted another 7-month pregnant Handbag Buyer.

b) In 2011, female employees at the Gucci Shenzhen, China, store alleged "inhuman" working conditions, including but not limited to: working long hours without payment; standing for more than 14 hours a day, which caused some to terminate their pregnancies; and, causing them to suffer from various occupational diseases, including stomach and urinary system illnesses.

c)  In 2011, a female tax attorney for Gucci alleged she was subjected to racial discrimination and sexual harassment, that her boss called her a "prostitute" and "cheap day labor," and that when she took a leave of absence to deal with the emotional distress, she was fired.

d)  In 2014, two female employees, who were fired after they complained, filed a class action complaint in California alleging Gucci failed to pay them minimum and overtime wages, or provide them with rest and meal periods.

e)  In 2016, a female employee at Gucci Chicago alleged she was sexually harassed by her male supervisor, received a poor performance review after she rejected him, and that Gucci ignored her complaints. Rather than fire him, Gucci moved the supervisor to Gucci Coral Gables (Florida).

f)  In 2019, Gucci forced its female runway models to walk the runway in straightjackets. "It is in bad taste for Gucci to use the imagery of strait jackets and outfits alluding to mental patients, while being rolled out on a conveyor belt as if a piece of factory meat," stated model Ayesha Tan.

g)  In 2021, a transgender Gucci employee filed suit, alleging she was called "fucking bipolar" and "crazy," and told to "leave the business." The day the plaintiff returned to work from a mental health leave of absence, management called her into the office, which caused her to have a panic attack.

h)  In 2022, after a female Gucci Senior Media Director returned from maternity leave, they gave her unfair performance reviews, demoted her, and HR told her she was "free to quit" if she did not like her working conditions.

## II.  DEFENDANTS HIRE PLAINTIFF AND COERCE HER INTO SELLING MILLIONS OF DOLLARS OF PRODUCT, WITHOUT PAY, OR OTHERWISE RISK TERMINATION.

### A. PLAINTIFF EARNS #2 STORE RANKING AND COMPLAINS OF DISCRIMINATION.

61.     In 2006, Defendants hired Plaintiff (female, then-38 years old) as a Sales Associate at Gucci Chicago, earning $16.00/hour.

62.     Upon Plaintiff's hiring, Plaintiff learned that, prior to the start of each new month, Defendants' corporate office assigned each store a monthly sales goal. Management then divided the store goal amongst each Sales Associate and pushed the "team" to hit the corporate-assigned, monthly store goal.

63.     **There is nothing more important to Gucci than sales. They monitor every single salesperson's sales by the hour, by the day, by the month, and by the year. They reward their Associates solely on how much they have sold.**

64.     Plaintiff also learned that each store ranked Associates by their total sales, in dollars, sold per month. At the time, employee David Benjamin (male, then-under 40) was #1 in the store. The store disclosed each Associate's total sales on a white board in the back room, which allowed for all Associates to know where they ranked overall, by total sales, compared to their colleagues.

65.     Management arbitrarily divided the store's monthly goal amongst the salespeople, based on what management thought the particular salesperson was capable of selling for the store. Lower-selling Associates were given lower goals, higher-selling Associates were given higher goals, and management's favorite employees were gifted opportunities to reach their goal more easily and faster.

66.     Managers personally profited by earning a bonus if their store "made goal" each month.

67.     Sales Associates earned a commission for each sale, paid two-weeks after making the sale. Items up to $2500 received 3% commission, and items $2500 and over earned 5% commission.

As a result, it was in an Associate's best interest to sell higher-priced goods for two reasons: 1) they reached their goal more quickly; and 2) they earned a higher commission.[6]

68.     Gucci had a policy of paying Plaintiff her commissions every two weeks after being earned.

69.     If an Associate did not reach their goal, they risked getting fired. In fact, during Plaintiff's tenure, the majority of Associates who were fired, were fired for not "making goal." Additionally, Defendants *rarely* fired an Associate for other infractions, like leaving cash out, having a messy stock room, yelling at co-workers, or allowing customers to walk-out of the store with items without paying for them.

70.     In 2007, Defendant's raised Plaintiff's wage to $16.50/hour. In 2008, Defendants raised Plaintiff's wage to $16.90/hour.  In 2009, her wage remained the same, $16.90/hour. In 2010, her wage was raised to $17.10/hour. In 2011, her wage was raised to $17.27/hour. In 2012, Plaintiff's wage was raised to $17.62/hour.

71.     In 2012, after six years with Gucci, Defendants sent Plaintiff to Milan for Fashion Week the first time, after she earned the #2 ranking in the Gucci Chicago store.

72.     In 2014, Gucci gave Gucci Chicago's #1 salesperson, David Benjamin (male, under 40), a personal assistant, Jordan Conover (male, under 40). Benjamin was not required to meet any criteria to earn that assistant. As explained below, at the time, the GG Club did not exist.

73.     After Conover was promoted into a new role, Benjamin was able to pick a replacement. Benjamin picked James Draft (male, under 40), promoting him from the stock room.

---

[6] For example, if an Associate was "goaled" at $100,000 for the month and sold 100 pairs of $1,000 shoes/belts, their commission would only be $3,000. But if the Associate sold 40 $2,500 bags, that Associate earned 5% commission per bag, or $5,000, and met the goal 2.5x as fast by only selling 40 items instead of 100 items. Stated another way, it as in a Sales Associate's best interest to sell higher priced goods.

74.     Benjamin held the #1 ranking, largely because Defendants gave him countless opportunities, favored him, and helped him: He was sent around the globe to international fashion shows, awards shows, celebrity events, selling events, and training experiences. This favoritism provided Benjamin with the ability - outside of the Chicago store - to reach his monthly sales goals, build client relationships and sell higher-priced specialty goods and jewelry.

75.     Plaintiff relied, to her detriment, on Defendants' equal opportunities statements and ethical claims, including a "guarantee of a motivating work environment which respects the dignity and rights of all individuals, fostering development and well-being," and its claims of providing "opportunities to grow from within."

76.     **In 2016, after 10 years of hard work, Plaintiff attained a ranking of #18 among all of Gucci America's 1000+ Sales Associates**.

77.     Plaintiff, now over 40, consistently saw that she was not being treated with equal opportunities to David Benjamin.

78.     **On or about March 11, 2016, Plaintiff emailed Manager Amy Hannaford, stating she "felt very strongly" that she was being discriminated against on the basis of her age and disabilities (anxiety and depression), and because she took medication for depression.** She further complained that she was being bullied, her colleagues had called her "crazy," and she was feeling unsupported by Management.

79.     A few hours later, Plaintiff emailed Gucci HR's Helen Papadatos, again complaining that she believed she was not being given an equal opportunity was because of her age and disability.

80.     Defendants refused to address Plaintiff's complaints of discrimination. Instead, Defendants preyed on her vulnerabilities and pushed her to sell more Gucci product.

## B.  DEFENDANTS FALSELY PROMISE PLAINTIFF AN ASSISTANT TO LURE HER INTO SELLING MILLIONS

81.    Despite complaining of discrimination, Plaintiff continued to perform and drive revenue for Defendants.

82.    In 2017, Plaintiff's hourly wage was increased to $20.00/hour.

83.    **Around 2017, Plaintiff started to close-in on Benjamin's #1 ranking, and she was far ahead of the rest of Gucci Chicago's approximately 20 other Associates.**

84.    Rather than support Plaintiff, Defendants took steps to ensure Benjamin maintained his #1 position and earned sales in manners that were against company policy. For example, when Benjamin was on vacation, his assistant rang sales for him from walk-in customers, depriving the working, in-store Associates of the sales. Neither Draft nor Benjamin was ever written-up for this fraudulent conduct.

85.    Plaintiff then asked Manager Hannaford if she too, like Benjamin, could have a personal assistant as she believed she had earned the opportunity to also have help with her clientele. **Manager Hannaford told Plaintiff if she attained a certain, multi-million-dollar sales goal that Gucci would give her an assistant.**

86.    Plaintiff relied on Manager Hannaford's statement, and its corporate statements that it fostered an environment for growth and provided equal opportunities. But, unbeknownst to Plaintiff, **Gucci had no intention of giving her an assistant**, and made this false promise only to coerce her into driving millions of dollars in revenue for the Chicago store and for Defendants overall.

87.    As a result of this promise, Plaintiff became determined to reach this very high sales goal and quickly started to catch up to Benjamin, largely because she was working off-the-clock to reach this goal that she would not have been able to attain by solely working on the floor in the store.

88.    **On December 19, 2017, Plaintiff reached the sales goal set by Defendants to secure her promised assistant.**

89.     Unbeknownst to Plaintiff, Defendants were secretly documenting her every move and interaction, in an effort to find pretextual reasons to write her up and deny her the assistant they promised her if she met the goal.

90.     **Defendants' first secretly documented incident was on December 9, 2017, essentially the exact same time she attained the sales goal.**

91.     When 2018 began, Plaintiff expected to receive her promised assistant, but the assistant never appeared.

92.     In 2018, Plaintiff's wage was increased to $20.60/hour.

93.     On or about February 28, 2018, Plaintiff contacted Gucci Human Resources Manager Jessica Buquicchio. She complained that she believed Defendants' failure to provide her with an assistant was discriminatory, i.e. that Benjamin had an assistant, and she did not, despite reaching her assigned quota.

94.     During the call, Buquicchio told her she would "look into" her complaint. Plaintiff never heard back.

95.     Plaintiff also complained to Manager Hannaford, stating she believed Gucci was discriminating against her.

96.     **Rather than address Plaintiff's complaint, Defendants continued to push Plaintiff to sell more Gucci, while psychologically torturing her with the false hope that she would eventually receive an assistant.** As a result, in early 2018, Plaintiff began to catch up to Benjamin for the #1 for the Chicago store ranking.

97.     Suddenly, on April 6, 2018, Defendant Hannaford surprised Plaintiff with a written warning. **This was Plaintiff's first disciplinary write–up ever, after working for the company for nearly 12 years.**

98.     The "warning" listed eight incidents that were not in chronological order or even accurately dated. For example, one incident allegedly occurred on Friday, December 21, 2017, and another on Saturday, December 23, 2017. The write-up included times Plaintiff complained that management gave a sale away to Benjamin, and that his assistant was fraudulently intercepting sales for him.

99.     **As mentioned above, Management was secretly documenting these infractions as early as December 9, 2017, just 10 days before Plaintiff attained her sales goal for the promised assistant.**

100.    In May 2018, Plaintiff emailed Managers Hannaford and Lisa Gutierrez disputing the write-up, and stating she was in a no-win situation, feeling "hopeless ... I always lose, I can never stand up for myself," and pointing out examples of disparate treatment.

101.    On or about July 2018, David's assistant, James Draft, was promoted yet again, to sales. In his place, Defendants gave Benjamin a new assistant named Adam Rudnicki (male, under 40). Rudnicki was an outside hire, and thus had no tenure or experience with Gucci.

102.    Shortly thereafter, on or about August of 2018, Benjamin was promoted to a corporate role in New York City.

103.    **Following Benjamin's departure, Plaintiff moved into Benjamin's #1 spot at Gucci Chicago, and, in August 2018, became #2 throughout all of Gucci America.**

104.    Defendants then told Plaintiff that she could have Benjamin's assistant (Rudnicki) but she had to share him with two other Associates (Tyler Guzman and Jenan Saab), who were both under 40, and their annual sales were each significantly less than Plaintiff's.

105.    Plaintiff complained to numerous people, stating she believed it was discriminatory and unfair to make her share an assistant with Guzman and Saab,

### C. DEFENDANTS CONTINUE TO PSYCHOLOGICALLY MANIPULATE PLAINTFF.

106.     According to trafficking organization Polaris, trafficking networks "rob human beings of their lives and their freedom," which is exactly what Defendants were doing here. Polaris reveals that signs of trafficking include force, fraud, or coercion efforts that are used to prevent workers from leaving their jobs; managers control of nearly all aspects of workers' lives and threaten them if they do not meet their sales quotas; psychological manipulation; verbal abuse; denial of wages; and, false promises.

107.     Here, Defendants continued to rob Plaintiff of her life, increasing her monthly goals without help to attain them, giving younger, non-disabled Associates more opportunities, and consistently moving the goal posts with greater promises that never manifested.

108.     Defendants took active steps to not provide Plaintiff with equal opportunities. As just one example, Defendants gifted Benjamin's VIG (Very Important Gucci customer) and VVIG (over $50,000 spend) clients to younger Associates, with less tenure, under 40 years old, and who had the lowest sales.

109.     As just another example of how Defendants tortured her, they refused to gift her any of Benjamin's top-spending clients upon his departure. Instead, they gifted these clients to younger, non-disabled, lower-selling Associates. When Plaintiff complained, stating she believed Defendants' gifting practices were unfair and discriminatory, and asked for metrics on how they decided who received a former Associate's clients, she was ignored.

110.     Meanwhile, Defendants continued to coerce Plaintiff by giving her a monthly goal that was nearly three times the goal of the other Associates, and at least 10-15% of the store's monthly goal. At the beginning of each month, Managers Hannaford and Kolosa would email Plaintiff her goal and invariably say, "We are all here to support your continuous growth!" In reality, Defendants did nothing to support her growth. Absolutely nothing.

111.     In early 2019, Benjamin, who was now in a corporate role and was previously Plaintiff's direct competitor, created a "GG Club," which apparently consisted of Gucci America "top performers." Its standards were vague, and its perks were even more vague. As detailed below, Benjamin now had direct control over Plaintiff's opportunities, rewards and recognition.

112.     On or about May 2019, Defendants told Plaintiff she was now getting her own assistant, Johnny, in a ploy to keep her hooked into thinking she was now going to have help.

113.     But when Plaintiff was not in the store, Defendants used Johnny for their own matters. Plaintiff complained about this practice, but her complaints were ignored.

114.     In June 2019, Kering issued a statement, stating, among other things, "... We are committed to improving the labour standards of those who work in our supply chains and businesses. This includes taking steps to both identify and address the risks of Modern Slavery."

115.     Kering never talked to Plaintiff, visited her store, or asked her for feedback related to its labor practices. If it had, it would have learned that Plaintiff was working in slave-like conditions, selling product 24/7 without pay, and with the highest goal in the store month-after-month.

116.     In December 2019, Johnny quit, to pursue his music career. Plaintiff was, yet again, without an assistant.

117.     Every time Plaintiff asked if Defendants were going to replace her assistant, Manager Hannaford would act genuinely concerned and promise that **"help is on the way," and, "we're working on it."** Plaintiff continued to perform without help.

118.     **By the end of the 2019 calendar year, Plaintiff reached an exceedingly high total sales goal with 170 total clients, earning over 10% of the store's annual goal by herself, despite there being over 20 other advisors.**

119.     On or about January 2020, Gucci told Plaintiff that Rudnicki was now going to be her Personal Assistant. Unbeknownst to Plaintiff, Defendants did not intend for Rudnicki to remain her assistant but rather for her to train him on how to be a Sales Associate, i.e. her direct competition.

120.     In March 2020, the COVID pandemic hit, closing the Gucci Chicago store temporarily. Plaintiff continued to maintain her #1 ranking in the store, helping to carry the store through the pandemic.

121.     Upon the store re-opening, Plaintiff asked why management never celebrated her milestones on group chats, while openly celebrating younger, less tenured and less successful Associates.

122.     In fact, deprivation of basic needs, like the need to just be congratulated, also creates a "unique relationship between victim and perpetrator ... once the perpetrator has established this degree of control, he becomes a potential source of solace as well as humiliation. "The capricious granting of small indulgences may undermine the psychological resistance of the victim far more effectively than unremitting deprivation and fear."[7]

123.     Then, on November 4, 2020, Defendants pulled Plaintiff into the office for her second-ever "Written Counseling," following an incident where she complained that walk-in clients were being abusive to her.

124.     Manager Hannaford told Plaintiff she must "strive to be a continuous learner," and be "curious to learn" and, if she had complaints, to report back to herself or Kolosa, the very people who consistently bullied her and ignored her complaints.

---

[7] LEWIS HERMAN, M.D., TRAUMA AND RECOVERY 77 (Basic Books 1992), *supra* note 12, at 77.

125.     Defendants did not give Plaintiff any "Counseling."[8] Despite claiming to champion equality in the workplace, Defendants failed to provide her with "learning" tools, or training modules to fix her "bad" behavior.

126.     In reality, the written "counseling" was yet another tool, meant to further scare Plaintiff, particularly because Defendants could have easily terminated her employment, but instead chose to keep her because they were earning millions of dollars off of her back.

127.     Then, days after Christmas, on December 27, 2020, Defendants told Plaintiff they were taking away her assistant (Rudnicki) because he, too, was being promoted to sales. As a result, Rudnicki (male, under 40) was now her direct competition.

128.     Plaintiff sent an email complaint to Defendants. In response, "Chief People Officer" Lucinda Rosso told her, "You have no claim for discrimination."

129.     By December 31, 2020, Plaintiff was again the #1 Associate in the store for the year 2020.

130.     By 2021, Plaintiff's PTO balance was 300 hours, working on the false promise that if she reached the new sales goal, she would finally be rewarded an assistant.

131.     Additionally, Management consistently made Plaintiff feel guilty when she requested time off, by saying things like, "Well, you know it's going to be a busy day and you'll miss a lot of sales;" "We really need your numbers," We are up against big numbers from last year," and "We were counting on you to help us." Plaintiff always caved to the pressure.

---

[8] According to Merriem-Webster, "counseling" is professional guidance of the individual by utilizing psychological methods especially in collecting case history data, using various techniques of the personal interview, and testing interests and aptitudes https://www.merriam-webster.com/dictionary/counseling

132.     On or about January 17, 2021, Defendants presented Plaintiff with a Gucci America Commission Plan - Commission Rate Form, effective December 27, 2020. Plaintiff signed the document, stating, "Signing but not 100% clear on understanding." Exhibit 9

133.     Now without an assistant, Defendants continued to assign Plaintiff with sales goals that were 2-3 times greater than anyone else's in the store, that she had to attain on her own, on her days off, and off-the-clock.

134.     Defendants psychologically tortured Plaintiff by actively attempting to prevent her from reaching her monthly quota. In fact, in February 2021, Plaintiff complained to Lucinda Rosso, stating she had to be "glued to her phone all day" and was constantly "nervous" about her business because Management actively worked to either not help her or actively give her sales away, which directly affected her monthly quota. Plaintiff documented this practice until her eventual firing, as detailed below.

135.     Defendants also gave other younger, lower-performing Associates numerous opportunities to grow their books of business and reach their individual sales goals.

136.     In March 2021, Plaintiff complained to Corporate Managers Chloe Battah and Courtney Hahn, as well as to Jessica Buquicchio and Lucinda Rosso at Gucci HR, about her working conditions, writing, "Things are becoming increasingly unbearable for me at my location. This is the third time over the last week I've left crying."

137.     Plaintiff also complained that Management told her she could not take time off, while allowing two Associates, with less tenure, less sales, and who were under 40, to take time off.

138.     In May 2021, Defendants suggested Plaintiff take FMLA - which she declined - rather than address her complaints of discrimination and abusive working conditions. Plaintiff wrote Buquicchio, **"I already see a therapist and he thinks you are all putting me through a nightmare**

..." Plaintiff further complained, in writing, that she was feeling **"extremely hopeless and depressed."**

139.    And yet, Plaintiff continued to out-perform the entire Gucci Chicago store and most of Gucci America.

140.    Unbeknownst to Plaintiff, **at the same time, Susan Chokachi, then-President and CEO of Gucci America, questioned another female employee's "stamina to return to work" after she had baby**, and warned the female employee not to seek further accommodations beyond working from home, despite everyone else working from home during COVID. Over the course of the next six months, Gucci demoted the female employee as part of an alleged "reorganization," gave her a negative performance review that she unsuccessfully attempted to refute, and then, attempted to get her to quit.

141.    Unbeknownst to Plaintiff, Lucinda Rosso told the abovementioned female employee, who had also complained of discrimination, that **she was "free to leave,"** and because she was an at-will employee, Gucci was "free to fire" her. Rosso also told the woman that Gucci found "no evidence" of discrimination.

142.    While receiving Plaintiff's complaints of discrimination, abuse, and psychological torture, Defendants continued to increase her sales quota, while watching her spiral into a deeper depression.

143.    Indeed, "high rates of emotional, behavioral, and psychological problems have been reported by trafficked and sexually exploited women, with the majority of women reporting symptoms such as depression or sadness, guilt and self- blame, anger and rage, and sleep disturbances."[9]

---

[9] *See* JANICE G. RAYMOND ET AL., A COMPARATIVE STUDY OF WOMEN TRAFFICKED IN THE MIGRATION PROCESS: PATTERNS, PROFILES, AND HEALTH CONSEQUENCES OF SEXUAL EXPLOITATION IN FIVE COUNTRIES (INDONESIA, THE PHILLIPINES, THAILAND, VENEZUELA, AND THE UNITED STATES) 71-73 (2002),

144.    Meanwhile Rudnicki - Plaintiff's former-assistant-turned-direct-competition - called one of Plaintiff's top-spending clients and made derogatory comments about her age, in an attempt to steal the client away from her. She reported his conduct to management. Her complaint was ignored.

145.    On or about June 2021, Plaintiff told HR's Buquicchio and Store Manager Hannaford, that she was "very worried" about herself after urinating in her pants on the sales floor because she was "trying so hard to service clients and clean and recover after each one." She further complained about favoritism and discrimination.

146.    On June 18, 2021, Gucci Executive VP-Retail Tommaso De Vecchi presented Plaintiff with a letter stating Gucci was "thrilled" to name her "Master Client Advisor," and include her in the "Class of 2021 GG Club" for having reached exceedingly high net sales for 2020.

147.    This "Club" falsely promised to provide Plaintiff "experiential rewards," "training opportunities," and "enhanced rewards." As detailed below, Plaintiff was given nothing of the sort.

148.    Additionally, as part of its scheme to exploit Plaintiff and continue to lure her into selling more Gucci product, Defendants continued to promise her trips, and told her to "hold out" for an assistant. Manager Hannaford told her they were "trying" to get her to Italy, and continued to promise that soon things would "get better" for her, while they sent others on trips and opportunities.

149.    Defendants posted her coworkers international work trips on Facebook and other internal messaging platforms, which caused Plaintiff extreme sadness because she was not included and Defendants refused to tell her why not.

150.    **In November 2021, Plaintiff was invited to her second-ever fashion show, after having not been invited for an entire decade.** During that decade, Defendants sent younger employees, with less tenure and less sales, to fashion shows and other global experiences. Every time Plaintiff asked why she was being excluded, and what Defendants' criteria was for who got to go, they

gave her a different reason. When Plaintiff complained that their practices were discriminatory, they ignored her.

151.     In November of 2021, Plaintiff complained to Defendants that she was experiencing increased depression, anxiety, and panic attacks. Defendants ignored her.

152.     In response, Lisa Gutierrez called her "crazy," which Plaintiff reported to Defendants, multiple times, on or about December 2021. Other times, Gutierrez called Plaintiff "paranoid," and "erratic," and said, **"You need to make a life choice; if you don't like it here you can leave."**

153.     Following this incident, Plaintiff complained, again, that she was being exploited, stating, "A crazy making no win situation where I'm told to have work life balance and take care of my health and rest but also given huge goals ... I have told my managers this/ I have pushed myself very hard here and I'm only one human being and it's a constant double bind ..." Defendants ignored her.

154.     Plaintiff then asked HR's Buquicchio if she could transfer stores, which Defendants refused, further trapping her in her environment. Defendants, however, allowed younger, less tenured Associates to transfer stores.

155.     Instead, Buquicchio emailed Plaintiff Kering's FMLA forms, again, while management continued to assign Plaintiff the highest goal in the store, forcing her to work 24/7 without an assistant, and without pay when she was working outside of the store.

156.     Plaintiff also complained to Kering's VP of Human Resources, Vanessa Bullen, who offered for her to participate in a free, 8-week therapy program through Aetna, "proven to reduce depression, stress, and anxiety." Plaintiff explained she already had a therapist, and was seeking equal treatment, and freedom from exploitation.

157.     And yet, throughout all of 2021, Plaintiff was not invited to a *single* selling event or fashion show. She watched as other Associates, under 40, with fewer sales and with less tenure, were

sent to fashion shows and selling events, trips to Italy, trips to other countries, in-store training, and buying experiences with clients.

158.     Additionally, Plaintiff learned that Defendants gave an assistant to a Sales Associate in Costa Mesa, who was a male, under 40, and who joined in 2020.

159.     Without an assistant and with the highest goals in the store, not only was Plaintiff required to sell 24/7, but she was required to get permission from a manager to go into the store on her days off, pull product, ship product, enter the sale in the system, and complete the transaction from start to finish.

160.     Furthermore, not only did Defendants deprive her of opportunities given to younger or male Associates, they did nothing to recognize or reward Plaintiff for her sales. Rather, Defendants recognized and rewarded other Sales Associates who sold less than Plaintiff, who were younger, and who had less tenure.

161.     Despite 2021 being her biggest selling year ever, and despite being arguably Gucci America's most veteran, top-selling advisor, Plaintiff learned that Defendants were demoting her from Master Client Advisor to Elite Client Advisor, which was the lowest ranking in the "GG Club." This demotion was in retaliation for her complaints about discrimination.

162.     For the calendar year 2021, Plaintiff personally sold over $5.1 Million in Gucci product. The above-mentioned 2021 commission structure was four-tiered, with the top-tier paying-out $20,000 for $4 Million in personal sales. When she asked if there was an additional bonus for reaching $5M, she was told no, and paid the top-tier commission.

163.     Defendants failed to provide Plaintiff with an explanation as to why she was being demoted. In fact, when she questioned the title demotion, Manager Laura Desai, a new hire, told Plaintiff that she "did not know what the word 'demotion' meant." And yet, with this lower title, she was less eligible for training opportunities, awards, and ... an assistant.

164.    When Plaintiff questioned Manager Hannaford directly, Hannaford told her, "I have no additional information ... You had an incredible year which everyone has acknowledged. I would stay focused on this."

165.    **Plaintiff complained in writing to Managers Amy Hannaford and William Blomquist, stating, "I don't think it's fair to expect this volume from me anymore. It's humanly impossible." They ignored her plea for help**.

166.    In January 2022, Defendants distributed a new commission plan structure to Plaintiff. Interestingly, this structure suddenly added a new top tier, to $5M, despite telling Plaintiff, who sold over $5M in 2021, that it did not exist. This new structure provided for $25,000 commission-bonus. Exhibit 10

167.    On or about March 10, 2022, Plaintiff contacted Tommaso De Vecchi, Gucci's Executive Vice President of Retail and Wholesale, asking him about the promised assistant. De Vecchi told Plaintiff, "Stay tuned, we are working on something that definitely answer [*sic*] to the needs you highlight. We just need a bit more of time to fine tune last details."

168.    Whatever De Vecchi and Defendants were "fine tuning" never revealed itself. Rather, Defendants gave two (2) Sales Associates - both males and under 40 - their own assistants.

169.    **Defendants also blatantly discriminated against Plaintiff's customer, on the basis of his age.** On or about March 2022, Management asked Associates to nominate their top clients for Billie Eilish concert tickets. **When Plaintiff nominated an older male, Defendants rejected him, stating, "I believe Corporate is looking for Gen Z or Millennial clients ... He may be suited for Elton John."**

170.    Plaintiff complained, stating that they were discriminating against her older client. Just days later, Defendants retaliated against Plaintiff, dropping her customer experience "NPS" score, and stripping of her "Master Client Advisor" title to "Elite Client Advisor."

171. On or about July 2022, Plaintiff was struggling with abusive clients and did not want to help them anymore. Only twice in her entire career had Plaintiff asked management to take over a customer. After watching her struggle, management finally came to her aid.

172. On or about September 2022, James Draft (male, under 40) was transferred to Beverly Hills, upon receiving a promotion. Defendants, however, continuously rejected Plaintiff's requests for a transfer.

173. **Also, in September 2022, Defendants sent Plaintiff on a "Top Performer" trip, her second-ever trip to Milan in her career.** This trip, however, was used to trick her into thinking that they did, indeed, provide her with equal opportunities.

174. On the way back from Milan, Plaintiff learned that Rudnicki, her former assistant-turned-competitor, took credit for a sale from one of her known VIG clients, which was against company policy. Plaintiff complained.

175. Just four days after she complained, management called Plaintiff into the office and **gave her a write-up for the above-mentioned incident in July, approximately two months earlier.** When management accused her of having "bad customer service," she disputed their allegations, stating she had a perfect customer service score, and questioned why she was not protected in her workplace from abusive customers.

176. Defendants did not place Plaintiff on a Performance Improvement Plan or provide her with opportunities to correct her behavior because she did not need to correct her behavior. Instead, the write-up was a tool to bully, intimidate, and scare her. Manger Kolosa told her, "Why are you upset? This won't stop you from getting an assistant next year." Kolosa was lying. She knew Defendants had no intention of giving her an assistant.

177.    Defendants continued to watch Plaintiff physically deteriorate from both her disabilities of anxiety and depression, coupled being forced to work 24/7 to reach the highest goal in the store, month after month.

178.    Plaintiff consistently complained to Defendants that she was suffering from anxiety and depression; that her body was breaking down, and she was struggling with ulcerative colitis due to work-related stress; that she was on anti-anxiety medication; and, that she was in therapy for depression and anxiety. Plaintiff told Defendants that she needed help and begged for equal treatment. Her requests and complaints were ignored.

### III.    PLAINTIFF SIGNS HER DEATH WARRANT BY FILING AN OFFICIAL EEOC COMPLAINT

#### A.  Plaintiff contacts Gucci CEO Marco Bizzarri via her lawyer

179.    In mid-2022, Plaintiff finally retained a lawyer. Initially, Plaintiff was afraid to file an official complaint, believing that, if she did, Gucci would fire her.

180.    On September 28, 2022, through counsel, **Plaintiff sent Gucci's then-CEO Marco Bizzarri a letter, laying out her accolades, as well as her complaints of discrimination and exploitation in her workplace.** Exhibit 11

181.    **CEO Bizzarri ignored the letter from his top-selling female employee**, despite claiming that Gucci had **"guiding principles"** that included ensuring an inclusive workplace for all employees by providing ongoing training programs, **resource groups and open dialogue in order to enhance communication, understanding and empathy; closing the gender pay gap for equivalent positions within the organization by 2025; and, creating greater opportunities in the workplace for people with disabilities.**

182.    And yet, Bizzarri never provided Plaintiff with "greater opportunities" other than pushing her to reach a monthly goal, outside of the workplace and without pay, living in a constant state of fear that if she did not perform, she would be fired.

183.    In November 2022, Defendants cut the maximum number of hours salespeople could work, from 40 to 35. And yet, Defendants increased Plaintiff's December goal to the highest goal in the store.

184.    Again, it was not humanly possible to reach her quota by selling only in the store, over the course of 140 store hours (35 hours x 4 weeks) per month. As a result, Plaintiff worked off-the-clock and around-the-clock, unpaid, to meet this goal.

185.    Throughout 2022, when Plaintiff complained about her goal being too high, management a

186.    **In December 2022, Plaintiff again met the astronomical goal. And, yet again, Plaintiff was #1 for the entire 2022 calendar year in the Gucci Chicago store, having sold millions of dollars in product, far beyond anyone else.**

187.    In January 2023, Plaintiff's father was dying, and was in local hospice care. Defendants knew she was struggling to manage her workload while attempting to manage his imminent death.

188.    Rather than help their 18-year veteran during this life event, Defendants used this as an opportunity to further traumatize her, deliberately giving her top clients to other Sales Associates, under 40, which was also against store policy.

189.    As just one example, Manager Kolosa, a "Schemer,"[10] saw one of Plaintiff's top clients enter the store and notified the Associates in the group chat. Rather than help Plaintiff's client and give the sale the Plaintiff (who was not in the store), Kolosa gave the sale to a younger, less tenured,

---

[10]  "Take the 'Screamer,' who is associated with yelling and fist-banging or the quieter but equally dangerous "Schemer" who uses Machiavellian plotting, gaslighting, and smear campaigns to strip others of resources or push them out. The Schemer doesn't necessarily have a position of legitimate power and can present as a smiling and eager-to-help colleague or even an innocent-looking intern. While hostile motivation and overt tactics align with the Screamer bully archetype and instrumental, indirect, and covert bullying is typical of the Schemer, a bully can have multiple motives and use multiple tactics — consciously or unconsciously." https://hbr.org/2022/11/how-bullying-manifests-at-work-and-how-to-stop-it

lower-ranking Associate. Kolosa knew it was against store policy, that Plaintiff would learn about what she did, and that it would upset Plaintiff, but Kolosa did it anyway.

190.     In January 2023, Plaintiff learned that Aneta Mysliwiec (under 40 and ranked lower in sales), was quietly sent to Milan Fashion Week for Gucci's first stand-alone Men's Show in three years. Plaintiff was not invited to Milan, without explanation. When she asked management about this, they told her, "It's nothing personal."

191.     Mysliwiec, who joined Gucci in 2015, had a store ranking that fluctuated between 11 and 7. Not once did she possess the #1 position in the store. And yet, Defendants invested in her, rather than in Plaintiff, sending her to the following events, including but not limited to:

    a)  DIY training in Milan, 2018 - Plaintiff had never been to a DIY training.

    b)  Fine jewelry event in Paris, July 2019 - Plaintiff had never been sent to a fine jewelry event.

    c)  7 fashion shows between 2018-2023 - Plaintiff had only been sent to 2 fashion shows between 2018-2023.

    d)  Elton John Oscar Party - Plaintiff had never been sent to an Oscar Party.

    e)  The LACMA (Los Angeles County Museum of Art) Awards - Plaintiff had never been sent to this Awards show.

    f)  Approximately 8-9 worldwide events, including Paris and LA.

    g)  2 private in-store events - Plaintiff was never given an in-store event.

192.     When Plaintiff asked why Mysliwiec was given these opportunities and she was not, she was ignored.

## B.  PLAINTIFF FILES AN EEOC COMPLAINT

193.     Upon realizing that if CEO of Gucci was not going to sound an alarm, an immediately come to her aid, Plaintiff filed a complaint with the EEOC, on January 19, 2023, alleging discrimination and retaliation.

194.    In response to Plaintiff finally seeking to legally enforce her rights, Defendants engaged in an organized effort to retaliate against her by seeking to fire her and destroy the livelihood she had maintained for nearly 20 years.

195.    Now knowing that Plaintiff's primary complaint was that Defendants had a discriminatory assistant-giving practice, Defendants temporarily took away the assistants from those who had them, rather than, finally, give her an assistant.

196.    Then, in February 2023, Plaintiff was again accepted into the GG Club as "Executive Client Advisor," meaning she was top 1% of all advisors in North America, top 1% of sales, top 1% of NPS customer service ranking, and highest sales-by-appointment in the company.

## C.  DEFENDANTS RETALIATE AGAINST PLAINTIFF FOR FILING AN EEOC COMPLAINT

197.    In June 2023, Plaintiff was, again, given the highest goal in the store. When she complained, again, management told her, "You always kill it."

198.    During June, while Plaintiff was on PTO, Manager Kolosa, yet again, gave away Plaintiff's VIG customer's sale to another Associate. Again, not only was this against policy, but Defendants did this to bully, terrorize and retaliate against Plaintiff.

199.    Despite personally ignoring Plaintiff's letter to him, begging for equal treatment and to be heard, CEO Bizzarri staged a "Chime for Change" puff piece for Gucci, stating, " The changes that we need to see in my lifetime, is a world where leaders, companies and ordinary people convene and try to unite all the voices that speak out for gender equality. If we are able to create the conditions to make people understand that there is a possibility to be safe, to be listened to, to be heard. My name is Marco and I chime for equality, opportunity, dignity and safety."[11]

---

[11] https://youtu.be/kJizJEUp9_s?si=ST7Y6PO7IpKkeBn6

200.    On July 1, 2023, Manager Hannaford approached Plaintiff, in front of Gutierrez, and said, "We made our June bonus because of you."

201.    On July 1, 2023, the last day of the fiscal month, Managers Amy Hannaford and Tracie Hepper approached Plaintiff while she was on the floor and carrying out her job duties, in the presence of other Associates and active customers, and told her, "We know it's not fair but we goaled you for $305,000 for July."

202.    This was the first time in Plaintiff's nearly 18- year career where she was given her sales goal while doing business and in front of others, on the last day of the fiscal month - instead of in email format on the first day of the new month. Management did this to deliberately to cause her stress, and force her to act out, despite knowing that she suffered from depression and anxiety.

203.    **In response, Plaintiff said, "If it's not fair, then why are you telling me this?" Defendants watched as Plaintiff started shaking and having a panic attack**, as she realized, again, that she would not be able to take time off because she would have to work 24/7 to make her goal.

204.    Plaintiff then learned that she had not been invited to the "top performer" gala in Italy, along with the other Executive Client Advisors. Plaintiff complained to Manager Hannaford and HR's Laura Desai, stating she believed she was being excluded as a form of retaliation her for complaint about discrimination, as there was no other plausible reason why she was being excluded. Defendants ignored her complaint.

205.    On July 6, 2023, Plaintiff received an email thanking her for making the June goal and her excellent results in June, and again reiterating that her July goal was $305,000, despite knowing that she had complained that it was too high, particularly because she was seeking time off. Plaintiff complained again and asked if the goal would be prorated for her requested time off.

206.     Several hours later, Plaintiff was called into the office and told that she was being suspended, and was "under investigation" for events that "happened over the weekend." When Plaintiff asked for an explanation, management told her, "You know what they are." **This was the first time Plaintiff had ever been suspended in her nearly 18-year career**.

207.     The "over the weekend" incident was that Plaintiff called Manager Hannaford, begging her for help, stating she believed Kolosa was setting her up. During that call, Hannaford told her, "Don't worry, I have your back."

208.     Indeed, "Verbal abuse, humiliation, threats, and other forms of psychological abuse represent deliberate attempts to break down the will of individuals ... [and] are often used to induce the sense of 'learned help- lessness,' that the abuse continues whether or not the victim cooperates."[12]

209.     Defendants told Plaintiff that she could still sell from home, but she could not have contact with any of her coworkers while she was "under investigation," further isolating her from her peers, further traumatizing her, and further scaring her to prove that she could perform her job.

210.     While Plaintiff was at home serving her 5-day suspension - and selling from her at-home labor camp to make her goal - she watched from the group chat as the other Associates broke rules with impunity: the stock room was in shambles, one Associate's customer walked out with a piece of jewelry without paying for it, and another Associate left money in the cash counter, among other fire-able offenses.

211.     On July 11, 2023, management then called her and said, "You're welcome to return to work tomorrow."

212.     When Plaintiff returned to work, on July 12, 2023, management called her back into the office, and handed her a "Final Written Warning." The "warning" accused her of calling Hannaford

---

[12] PHYSICIANS FOR HUMAN RIGHTS, INTERROGATIONS, TORTURE AND ILL TREATMENT: LEGAL REQUIREMENTS AND HEALTH CONSEQUENCES 8 (2004)

on her day off, and also listed other alleged violations of company policy that occurred over 9 months prior, despite the company previously stating that all write-ups fall off after 90 days. Plaintiff asked for an explanation of the 90-day policy that she believed existed. Management refused to answer her.

213.     Defendants then invited Plaintiff on a trip to NYC, only to cancel the invitation days later, in an effort to further confuse and traumatize her. Defendants refused to explain why they revoked the invitation.

214.     Plaintiff asked Defendants if they intended to reduce her July quota, given that she had not worked for 5-days in the store. Defendants did not respond, so Plaintiff continued to work to reach her goal.

215.     On or about July 25, 2023, Plaintiff filed a second charge with the EEOC, alleging that the suspension was a form of retaliation.

216.     Plaintiff earned, again, the #1 ranking in the store for the month of July 2023.

217.     Defendants then told Plaintiff, on August 8, 2023, that they had reduced her July goal, which was moot.

218.     On or about September 6, 2023, Hannaford knew Plaintiff was not working. Hannaford, however, needed over $6,000 in sales to reach the store's goal, asking the group to help her reach the goal. Plaintiff called her top-spending client, and made a sale over $11,000, which allowed Hannaford to make the store's goal. Plaintiff, however, was not paid for her off-the-clock time in making this sale.

219.     In September 2023, Defendants lured Plaintiff into bringing her top clients into the store for a "high-end customization event" where they had to pay, in full, for their items that would be delivered on a later date.

220.     At the "event," Plaintiff singlehandedly pre-sold $80,000 worth of Gucci product to her clients. Plaintiff reasonably believed she had earned commissions for these sales.

221.     In September 2023, Plaintiff was, again, assigned the highest quota in the Gucci Chicago store. And yet, during a virtual sales appointment, a corporate salesman refused to help Plaintiff and her customer. Her client complained to Gucci about how both she and Plaintiff were treated. Plaintiff emailed Managers Amy Hannaford and William Blomquist that she believed this was retaliation for her EEOC complaint.

222.     Also in September 2023, Defendants held their annual fashion show in Milan, Italy, which Plaintiff was not invited to. Plaintiff complained to Defendants that being excluded from Fashion Week, yet again, was unfair and retaliation for having filed the EEOC complaint. Plaintiff asked Defendants for the metrics on how they determined who was invited, to no avail.

223.     During this time, Defendants' attorneys stated they were interested in mediating her discrimination complaint, but then, disappeared, refusing to answer Plaintiff's lawyer's emails.

224.     Then, on October 4, 2023, Management called Plaintiff into the office and told her she was being fired for two incidents a month earlier, on September 3 and September 4, 2023. In both of these incidents, Plaintiff had gone to management, seeking their help.

225.     In firing Plaintiff, without any severance, Defendants knew Plaintiff would struggle to find alternative work in a similar space, after nearly devoting nearly 18-years to Defendants.

### D. EVEN AFTER THEY FIRE HER, DEFENDANTS CONTINUE TO UNJUSTLY ENRICH THEMSELVES.

226.     Not only did Defendants not pay Plaintiff her commissions earned the high-end customization event where she sold $80,000 in Gucci product, in September 2023, but they intentionally redirected her commissions to other Associates and Managers.

227.     Specifically, when the items arrived in the store, after Plaintiff was fired, Management notified her former clients, then, when they arrived in the store, Defendants returned the items sold under Plaintiff's name, then re-rang them, in other employees' names. In fact, Plaintiff's former clients texted her their receipts, showing her what Defendants were doing.

228. Then, to intentionally traumatize her further, Defendants immediately started to contact her multi-million-dollar book of business, that she built over the course of nearly-18 years, including 9 VVIG's and 42 VIGS, the most of any Associate at Gucci Chicago. To date, they continue to tell her clients things like "we miss you," and offer them perks that they did not offer to them when they were working with Plaintiff. Some Associates told Plaintiff's clients that she quit.

229. In December 2023, over two months after firing Plaintiff, Defendants sent a holiday gift to her other former clients (that did not know she had been fired), along with a letter claiming to be signed by her, asking then to scan a QR code and purchase items.

230. Defendants engaged in a continuous practice of discrimination. Plaintiff makes all claims herein under the continuing violations doctrine.

231. Defendants engaged in a pattern and practice of both discrimination and retaliation.

232. Defendants' theft of her commissions, and years-long abuse of her, have caused her to sustain serious and permanent personal injuries, including permanent psychological injuries.

233. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition, including depression and anxiety, and all physical manifestations of these diagnoses.

## CAUSES OF ACTION

### COUNT I
### Violation of Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589
### *(Against All Defendants)*

234. Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

235. The Trafficking Victims Protection Reauthorization Act (TVPA) allows for a private cause of action against anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of

serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. §1589(a).

236.     The TVPA also provides a private cause of action against anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in [§1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means ..." 18 U.S.C. §1589(b).

237.     To successfully plead a forced-labor claim under §1589, Plaintiff must adequately allege that Defendants used "threats of serious harm" to obtain her services. "Serious harm" "means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

238.     "Section 1589 is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion." *See United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008)

239.     Abuse of power or the vulnerability of others means the victim "believes he or she has no reasonable alternative but to submit to the labor or service demanded..."[13] Such coercion includes but is not limited to taking advantage of the vulnerabilities resulting from the person having entered the country illegally or without proper documentation, pregnancy, any physical or mental disease or

---

[13] Model Law to Combat Trafficking in Persons, *supra* note 6, art. I, sec. 108.

<u>disability of the person</u>, including addiction to the use of any substance, or reduced capacity to form judgments by virtue of being a child (emphasis added).

240.     Defendants violated 18 U.S.C. §1589(b) by knowingly receiving benefits, financial or otherwise, from the scheme, plan or pattern of abuse towards Plaintiff, and these ventures were designed to obtain labor or services from Plaintiff by means prohibited under 18 U.S.C. §1589(a), including but not limited to:

   a)   Consistently giving her the highest goal in the store, despite her complaints that she could not physically keep up with the quota;

   b)   Consistently refusing to give her help, despite helping others;

   c)   Intentionally taking sales away from her, which adversely affected her quota and further caused her increased anxiety and depression;

   d)   Repeatedly making comments about her age, including, "Gen Z is where it's at," which made her feel insecure about keeping her job as the oldest client advisor in the store;

   e)   Gaslighting her by ignoring her complaints about disparate treatment, and then writing her up for her complaints;

   f)   Calling her "crazy" despite knowing she had anxiety and depression; and,

   g)   Shaming her when she requested time off, and making her work off-the-clock to achieve her humanly impossible goal.

241.     Defendants knew she had a mental condition of depression and anxiety, and preyed on her condition, which thereby caused Plaintiff to believe she had no reasonable alternative but to submit to Defendants' labor demands.

242.     Defendants knowingly obtained the labor and services of Plaintiff in violation of 18 U.S.C. § 1589(a)(2) by means of serious harm, including but not limited to:

   a)   Causing her increased depression and anxiety;

   b)   Placing her in constant fear of losing her job if she did not make her goal;

   c)   Forcing her to work without pay;

   d)   Causing loss of hair, loss of bladder control, and loss of sleep;

e) Suspending her for pretextual reasons for filing an EEOC complaint; and,

f) And, then, terminating her for pretextual reasons; thereby, proving that her fear that she if complained, Defendants would destroy her livelihood.

243. Defendants knew, or acted in reckless disregard of the fact that the aforesaid ventures engaged in providing or obtaining Plaintiff's labor or services by means prohibited under 18 U.S.C. §1589(a).

244. Wherefore, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss her career; punitive damages; and, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
### Violation of Illinois Trafficking Protections Victims Act, 740 ILCS 128
#### *(Against All Defendants)*

245. Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

246. Defendants knowingly subjected Plaintiff to provide labor and services obtained through a scheme of abusive and coercive behavior intended to cause Plaintiff to believe that if she did not provide that labor and those services, she would suffer serious harm, as described by the involuntary servitude provisions of the Trafficking Victims Protection Act, 740 ILCS 128/10, and the Illinois Criminal Code of 2012, 720 ILCS 5/10-9(7.5), (10)(b)(6).

247. The serious harm Defendants caused Plaintiff to believe she would suffer, and did suffer, includes, but is not limited to, non-physical harm including but not limited to financial harm: terminating her from her job, for pretextual reasons, after nearly 18-years of employment.

248. Defendants knowingly subjected Plaintiff to provide labor and services obtained by using physical harm - hair loss, panic attacks, incontinence - intimidation over Plaintiff, as described by the involuntary servitude provisions of the Trafficking Victims Protection Act, 740 Ill. Comp. Stat.

128/10, and the Illinois Criminal Code of 2012, 720 Ill. Comp. Stat. 5/10-9(10)(b)(1), (5). The physical

harm, intimidation, and financial control includes, but is not limited to:

    a)   Physical harm stemming from sleep deprivation, incontinence, loss of hair;

    b)   Intimidation stemming from constantly increasing Plaintiff's quota every month;

    c)   Financial control by failing to pay her earned wages, thereby depriving Plaintiffs of any livelihood or assets; and,

    d)   Reputational harm by firing her without cause after she devoted her entire career to Defendants.

249.    Plaintiff brings this claim under the civil cause of action for victims of involuntary servitude in 740 Ill. Comp. Stat. 128/15(b-1).

250.    As a direct and proximate cause of Defendants' actions, Plaintiff has sustained damages, including physical and mental injury and economic loss.

251.    Wherefore, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss her career; punitive damages; and, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT III
## VIOLATION OF AGE DISCRIMINATION EMPLOYMENT ACT
### *(Against All Defendants)*

252.    Plaintiff adopts, realleges, and incorporates by reference all allegations above, and as alleged in her EEOC Charges, alleging age discrimination.

253.    Plaintiff was over 40 years old and was qualified for her position.

254.    Plaintiff always performed her job satisfactorily.

255.    Defendants refused to give Plaintiff equal opportunities because of her age.

256. As described above, Defendants violated the ADEA, by engaging in conduct including but not limited to providing similarly situated Sales Associates, under 40, with assistants, selling opportunities and travel opportunities that Defendants did not provide to Plaintiff, who was over 40.

257. Further, Plaintiff consistently asked for metrics, seeking to understand why her colleagues under 40 were given opportunities that she was not. Defendants never produced those metrics or gave her any reason for their disparate treatment of her compared to her colleagues who were under 40, and not-disabled.

258. Plaintiff exhausted her administrative remedies.

259. As a result of Defendants' conduct, Plaintiff has suffered damages including economic losses and emotional distress, in an amount to be determined at trial.

260. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

261. Wherefore, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss her career; punitive damages; and, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### ADEA - Age Discrimination - Retaliation
### *(Against All Defendants)*

262. Plaintiff adopts, realleges, and incorporates by reference all allegations above, and as alleged in her EEOC Charges, alleging retaliation for complaining about a protected activity, age discrimination.

263. For years, Plaintiff consistently complained about age discrimination, which Defendants ignored. But then, in January 2023, Plaintiff finally filed a EEOC charge of discrimination, including but not limited age discrimination.

264.     Upon Plaintiff filing her charge, Defendants retaliated against her, writing her up for pretextual reasons and suspending her for five days in July 2023. Plaintiff filed a second charge of discrimination, alleging retaliation.

265.     Finally, in October 2023, Defendants fired Plaintiff for pretextual reasons, in retaliation for filing a second charge of discrimination.

266.     Wherefore, Plaintiff seeks a judgement awarding Plaintiff damages in an amount to be determined at trial for economic losses, including but not limited to front pay, back pay, lost benefits, liquidated damages, and attorney's fees.

## COUNT V
## VIOLATION OF AMERICANS WITH DISABILITIES ACT OF 1990
### *(Against All Defendants)*

267.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

268.     Under the Americans with Disabilities Act ("ADA"), it is unlawful for covered employers to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment," pursuant to 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4.

269.     Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (*ADA*), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

270.     Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

271. To determine whether an individual is disabled under the ADA, the statute "shall be construed in favor of broad coverage of individuals . . . to the maximum extent" permitted by law, pursuant to 42 U.S.C. § 12102(4)(A).

272. A "disability" is defined by the ADA as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(1)(A)–(C). Ms. Cohen's Complaint alleges that her clinical depression and anxiety disorders constitute a physical or mental impairment that substantially limits a major life activity; that she has a record of such impairment; and, that she was regarded as having such an impairment.

273. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her disability – namely that she was treated less favorably than other similarly situated employees who were not disabled.

274. As a result of Defendants' discriminatory conduct, Plaintiff has suffered damages including economic losses and emotional distress, in an amount to be determined at trial.

275. Defendants' actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

276. Wherefore, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgement interest

**COUNT VI**
**AMERICANS WITH DISABILITIES ACT - Hostile Work Environment**
*(Against All Defendants)*

277. Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

278. A plaintiff may assert a claim for an illegal hostile work environment on the basis of disability under 42 U.S.C. § 12112(a).

279. Defendants were "employers" under 42 USC § 12111(5)(A) and Plaintiff was their employee under 42 U.S.C. § 12111(4).

280. The ADA's definition of "employer" includes the employer's agents.

281. Managers Amy Hannaford and Elizabeth Kolosa were agents of Defendants.

282. Managers Kolosa and Hannaford subjected Plaintiff to persistent harassment on the basis of her disabilities, depression and anxiety. Defendants conduct was severe or pervasive and both objectively and subjectively offensive by calling her "crazy," ignoring her consistent complaints of disparate treatment, watching her have panic attacks on the floor after increasing her goal; giving away her sales to other, non-disabled employees to cause her to be upset; gaslighting her, and refusing to help her despite her pleas.

283. Hannaford and Kolosa's harassment interfered with the performance of Plaintiff's work by creating a hostile and offensive working environment.

284. Defendants failed to take any action to prevent supervisors from harassing plaintiff, including failing to address her complaints, or promulgating any written policy regarding harassment or bullying.

285. Wherefore, as a direct result of the disability-based harassment that Defendants allowed, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgment interest.

## COUNT VII
## AMERICANS WITH DISABILITIES ACT - Retaliation

*(Against All Defendants)*

286.    Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

287.    Plaintiff engaged in protected activity.

288.    Defendant terminated Plaintiff for her protected activity. Plaintiff, at all times employed by Defendant, performed his job satisfactorily. 49. As a result of Defendant's conduct, Plaintiff has suffered damages including economic losses and emotional distress, in an amount to be determined at trial. 50. Defendant's actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

289.    Plaintiff opposed Defendants' unlawful acts and practices and was retaliated against as set forth herein, including but not limited to being suspended in July 2023, after filing a complaint with the EEOC and then, ultimately, firing her on October 4, 2023.

290.    Wherefore, as a direct result of the disability-based harassment that Defendants allowed, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgment interest.

### COUNT VIII
### VIOLATION OF ILLINOIS HUMAN RIGHTS ACT - Age
*(Against All Defendants)*

291.    Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

292.    Defendants were employers under 775 ILCS 5/2-101(B) and Plaintiff was an employee under 775 ILCS 5/2-101(A).

293.    Under the IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection

for training or apprenticeship, discharge, discipline, tenure or terms, privileges, or conditions of employment on the basis of unlawful discrimination. 775 ILCS 5/2-102(A).

294.     Defendants, through its agents and employees], including but not limited to Amy Hannaford, Elizabeth Kolosa, and Lisa Gutierrez, violated the IHRA when they subjected Plaintiff to impermissible discrimination on the basis of her age.

295.     Plaintiff performed her job to her employer's legitimate expectations, and beyond, but despite her reasonable performance, she was subjected to adverse employment actions, including but not limited to not receiving an assistant, not being allowed to transfer stores, not being promoted, not being sent on company trips, and not being provided with private shopping experiences with her clients, while younger employees with less experience, less sales and lower ranking were given these promotions and opportunities.

296.     Wherefore, as a direct result of the discrimination that Defendant allowed, Plaintiff is entitled to damages including but not limited to compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest.

## COUNT IX
### VIOLATION OF ILLINOIS HUMAN RIGHTS ACT - Disability
#### *(Against All Defendants)*

297.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

298.     Plaintiff brings Count IX under the IHRA against Gucci America, Inc. for discriminating against her on the basis of her disabilities, depression and anxiety.

299.     Defendants were employers under 775 ILCS 5/2-101(B) and Plaintiff was its employee under 775 ILCS 5/2-101(A).

300.     Under the IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection

for training or apprenticeship, discharge, discipline, tenure or terms, privileges, or conditions of employment on the basis of unlawful discrimination. 775 ILCS 5/2-102(A).

301.     Defendant, through its agent[s] and employee[s], including but not limited to Amy Hannaford, Elizabeth Kolosa, violated the IHRA when they subjected Plaintiff to impermissible discrimination on the basis of her disabilities of depression and anxiety.

302.     Plaintiff performed her job to her employer's legitimate expectations, but despite her reasonable performance, she was subjected to adverse employment actions, including not being given an assistant, not being invited to fashion shows, not being given selling opportunities, and being written up for attempting to advocate for herself, while non-disabled employees with lesser experience, lower sales and less tenure were offered these opportunities and not written up for their behavior.

303.     As a direct result of the discrimination that Defendants allowed, Plaintiff is entitled to damages including but not limited to compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest.

**COUNT X**
**VIOLATION OF ILLINOIS HUMAN RIGHTS ACT - Hostile Work Environment**
*(Against All Defendants)*

304.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

305.     Plaintiff brings Count X under the IHRA against Defendants for hostile work environment harassment for her disabilities, depression and anxiety.

306.     Defendants are employers under 775 ILCS 5/2-101(B) and Plaintiff was an employee under 775 ILCS 5/2-101(A).

307.     Under the IHRA, it is a civil rights violation for any employer, employee, or agent of any employer to engage in harassment on the basis of an employee's disability. 775 ILCS 5/2-102(E-1).

308.     The IHRA defines harassment as, in relevant part:

> (E-1) Harassment. "Harassment" means any unwelcome conduct on the basis of an individual's actual or perceived race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, unfavorable discharge from military service, or citizenship status that has the purpose or effect of substantially interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment. For purposes of this definition, the phrase "working environment" is not limited to a physical location an employee is assigned to perform his or her duties. 775 ILCS 5/2-101.

309.     Defendant, by its agents and employees, violated the IHRA when it engaged in severe and pervasive harassment of Plaintiff during the course of her employment.

310.     The harassment took many forms, including but not limited to calling her crazy, telling her to quit, ignoring her complaints that she was suffering, writing her up when she attempted to advocate for herself, and bullying her.

311.     The harassment interfered with the performance of Plaintiff's work by creating a hostile and offensive working environment, constituting an adverse employment action.

312.     Defendants had actual and/or constructive notice of the harassment and failed to take any action to prevent further harassment.

313.     As a direct result of the harassment that Defendant allowed, Plaintiff is entitled to damages, including but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, attorneys' fees and costs, and pre-judgment interest.

**COUNT XI**
**VIOLATION OF ILLINOIS HUMAN RIGHTS ACT**
**Retaliation - Disability and Age**
***(Against All Defendants)***

314.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

315.     Plaintiff brings Count XI under the IHRA against Defendants for retaliation.

316.     Under the IHRA, it is a civil rights violation for any employer, employee, or agent of any employer to retaliate against an employee because the employee believes they were a victim of harassment in employment, and objected to, complained about, or otherwise opposed the harassment. 775 ILCS 5/2-102; 5/6-101.

317.     Defendants are an "employer" under 775 ILCS 5/2-101(B) and Plaintiff was an employee under 775 ILCS 5/2-101(A).

318.     On or about January 19, 2023, Plaintiff engaged in protected activity by filing a Charge of Discrimination with the EEOC. Then she filed a second charge on or about July 25, 2023, alleging retaliation, after Defendants suspended her for pretextual reasons.

319.     Defendants, through their agent and employee [job title(s), name(s)] violated the IHRA on October 4, 2023, when [he/she/they] terminated Plaintiff's employment in retaliation for her protected activity.

320.     As a direct result of Plaintiff's retaliatory firing, Plaintiff is entitled to damages including but not limited to compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest.

## COUNT XII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *(Against All Defendants)*

321.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

322.     Defendants' years' long refusal to address Plaintiff's complaints of discrimination and bullying was extreme and outrageous conduct, as well as Management calling Plaintiff "crazy."

323.     Defendants' conduct of consistently increasing Plaintiff's monthly sales goals, in an effort to trick her into believing she was going to be rewarded an assistant, and receive other perks,

and writing her up for things that they did not write-up others for was extreme and outrageous conduct.

324.     Defendants intended to cause or recklessly or consciously disregarded the probability of causing emotional distress by ignoring Plaintiff's complaints of discrimination, and increasing her goal without providing her with any help and requiring she work 24/7, off-the-clock and without pay to reach her goal.

325.     As a direct and proximate result of the above-described actions, Plaintiff was and continues to be harmed, suffering severe emotional distress.

326.     Wherefore, for the foregoing reasons, plaintiff asks this Court to enter judgment in her favor and against all Defendants for her damages, plus interest and reimbursement for the costs of litigation, as well as all other relief this Court deems fair and just.

## COUNT XIII
## BREACH OF CONTRACT
### *(Against Gucci America, Inc.)*

327.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

328.     Plaintiff brings Count XIII pursuant to breach of contract for Gucci America, Inc.'s failure to pay her for all hours worked and for her earned commissions.

329.     Plaintiff and Gucci America, Inc. were two parties to an employment agreement ("the contract"), with Gucci America, Inc. being Plaintiff's employer.

330.     As a term and condition of the contract, Gucci America, Inc. promised to pay Plaintiff for all hours worked during the course of her employment.

331.     Throughout the entire course of her employment, Gucci America, Inc. did not pay Plaintiff for mandatory, off-the-clock work for hours worked off-the-clock and outside of the Gucci

Chicago store, in an effort to make her monthly quota that she would not have been able to make by working only in the store.

332.     Further, as a term and condition of the contract, Gucci America, Inc. promised to pay Plaintiff commissions at a rate of 3% of net sales made during the course of her employment.

333.     Plaintiff performed all duties required of her by the contract in a sufficient manner.

334.     Plaintiff continued to work in accordance with the contract, until she was terminated on October 4, 2023, without being paid for all hours worked or for the entirety of her earned and agreed to commissions.

335.     As a direct result of Defendant's unlawful breach of the contract, Plaintiff was damaged in the form of being denied her compensation, including payment of her hourly rate for all hours worked and for payment of the entirety of her earned and agreed to commissions.

336.     In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including past and future economic losses, and prejudgment interest.

## COUNT XIV
## UNJUST ENRICHMENT (in the alternative)
### *(Against Gucci America, Inc.)*

337.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

338.     Plaintiff brings Count XIV pursuant to common law unjust enrichment for Gucci America, Inc.'s failure to pay her for all hours worked and for unearned commissions.

339.     "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011), quoting *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 545 (Ill. 1989).

340.     Throughout all her entire employment, beginning in 2006, Plaintiff worked off-the-clock and outside of the Gucci Chicago store, to Plaintiff's detriment, and Gucci America, Inc. failed to pay Plaintiff for mandatory, off-the-clock work for hours she worked, in an effort to make her assigned monthly sales quota.

341.     Further, to Plaintiff's detriment, Gucci America, Inc. failed to pay Plaintiff commissions at a rate of 3% of net sales made during the course of her employment, for at least $80,000 in commissions earned.

342.     Gucci America, Inc. benefitted from Plaintiff's sales and off-the-clock work in the form of increased sales and uncompensated labor.

343.     Wherefore, in light of the foregoing, Plaintiff is entitled to damages, including payment of her hourly rate for all hours worked, and for payment of the entirety of her earned and agreed-to commissions.

## COUNT XV
## VIOLATION OF FAIR LABOR STANDARDS ACT
### *(Against Gucci America, Inc.)*

344.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

345.     The FLSA requires that employers pay all non-exempt employees not less than minimum wage for each hour worked in a workweek. 29 U.S.C. § 206.

346.     Defendant Gucci America, Inc. was Plaintiff's employer and Plaintiff was Defendant's employee within the meaning of the FLSA. 29 U.S.C. § 203(d), (e).

347.     Defendant violated the FLSA by failing to pay Plaintiff at least minimum wage for all hours Plaintiff worked.

348.     Defendant's violation was willful.

349.     As a direct result of Defendant's violation of the FLSA, Plaintiff suffered the loss of compensation in the form of unpaid wages.

350.     In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including actual damages in the form of Plaintiff's unpaid minimum wages; liquidated damages, per the FLSA, of double her actual unpaid minimum wages; reasonable attorneys' fees and costs; and such other and further relief as this Court deems appropriate and just.

## COUNT XVI
## VIOLATION OF ILLINOIS MINIMUM WAGE LAW (IMWL)
### *(Against Gucci America, Inc.)*

351.     Plaintiff adopts, realleges, and incorporates by reference all allegations above as though they were fully rewritten.

352.     The IMWL incorporates the FLSA's standards, including that for payment of a minimum wage. See 820 ILCS § 105/1 *et seq.*; 820 ILCS § 105/4(a); *Morgan v. SpeakEasy, LLC*, 625 F. Supp. 2d 632, 650 (N.D. Ill. 2007) (holding the IMWL parallels the FLSA, and the same analysis generally applies to both statutes).

353.     The IMWL requires an employer to pay its covered, non-exempt employee according to the following pay scale: January 1, 2005 through June 30, 2007 – not less than $6.50 per hour; July 1, 2007 through June 30, 2008 – not less than $7.50 per hour; July 1, 2008 through June 30, 2009 – not less than $7.75 per hour; July 1, 2009 through June 30, 2010 – not less than $8.00 per hour; July 1, 2010 through December 31, 2019 – not less than $8.25 per hour; January 1, 2020 through June 30, 2020 – not less than $9.25 per hour; July 1, 2020 through December 31, 2020 – not less than $10 per hour; January 1, 2021 through December 31, 2021 – not less than $11 per hour; January 1, 2022 through December 31, 2022 – not less than $12 per hour. See 820 ILCS § 105/4.

354.     Defendant Gucci America, Inc. was Plaintiff's employer and Plaintiff was Defendant's employee within the meaning of the IMWL. 820 ILCS § 105/3(c), (d).

355.    Plaintiff was a covered and non-exempt employee as defined under the IMWL.

356.    Defendant violated the IMWL by failing to pay Plaintiff at least minimum wage for all hours Plaintiff worked.

357.    Defendant's violation was willful.

358.    As a direct result of Defendant's violation of the IMWL, Plaintiff suffered the loss of compensation in the form of unpaid wages.

**COUNT XVII**
**VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
**Unpaid Final Compensation - Earned Commissions**
*(Against All Defendants)*

359.    Plaintiff adopts, realleges, and incorporates by reference all allegations above.

360.    Plaintiff brings Count XVII under the IWPCA for Defendants' failure to pay her earned and agreed to commissions.

361.    The IWPCA requires employers to pay their employees according to their agreements and to pay employees all earned wages or final compensation, including "earned commissions." 820 ILCS 115/2.

362.    Plaintiff was Gucci America, Inc.'s employee, and Gucci America, Inc. was Plaintiff's employer, as defined under the IWPCA. 820 ILCS 115/2.

363.    As a term and condition of employment, Plaintiff was promised commissions at a rate of 3-5% of net sales made during the course of her employment.

364.    The commissions owed to Plaintiff constitute an "earned commission" as defined under the IWPCA, as Plaintiff had met all conditions for earning the award and there was an unequivocal promise to pay it as required by the IWPCA. 56 Ill. Adm. Code 300.510(a).

365.    Decision makers, corporate officers, and agents who knowingly permit the violation of the IWPCA face individual liability for such violations. 820 ILCS 115/13.

366.    At all times relevant herein, Defendants had numerous "decision makers" as defined under the IWPCA. 820 ILCS 115/13.

367.    At all times relevant herein, as Amy Hannaford, Elizabeth Kolosa, Laura Desai, and Tracie Hepper made significant personnel and financial decisions, including payment of separated employees' earned commissions upon termination.

368.    On October 4, 2023, Plaintiff was terminated without being paid the entirety of her earned and agreed to commissions.

369.    Plaintiff earned commissions based on the sales she made on behalf of Gucci America, Inc.

370.    Plaintiff continued to work in accordance with Gucci America, Inc.'s commission structure up and until her termination on October 4, 2023.

371.    Plaintiff performed her obligations to earn commissions based on percentages of all sales she made on behalf of Gucci America, Inc.

372.    Defendants that Plaintiff had earned commissions and took part in the decision to refuse to pay Plaintiff the entirety of her earned and agreed to commissions.

373.    Defendants knowingly and willfully violated the IWPCA by failing to pay Plaintiff's earned commissions as her final compensation.

374.    As a direct result of Defendants' violation of the IWPCA, Plaintiff was damaged in the form of being denied her final compensation, to wit, her earned commissions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, Tracy Cohen, prays that this Court finds in her favor and awards her:

i.     for the first cause of action against Defendants for trafficking in violation of 18 U.S.C. §
       1589, a judgment awarding Plaintiff damages in an amount to be determined at trial,
       including, without limitation, damages to physical well-being, emotional and psychological
       damages, past and future economic losses, loss of career opportunities, together with
       punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and
       disbursements;

ii.    for the second cause of action against Defendants for trafficking in violation of 740 ILCS
       128, a judgment awarding Plaintiff damages in an amount to be determined at trial,
       including, without limitation declaratory and injunctive relief; costs of litigation and
       attorneys' fees; compensatory damages including, but not limited to: (i) economic loss,
       including damage, destruction, or loss of post or future earning capacity, and, any
       statutorily required wages under applicable State or federal law; and (ii) damages for mental
       and emotional harm, including medical, pain and suffering, and physical impairment;
       punitive damages; and damages in the amount of the gross revenues received by
       Defendants from, or related to, Plaintiff's activities.

iii.   for the third cause of action against Defendants for violation of the ADEA - Age
       Discrimination, a judgement awarding Plaintiff damages in an amount to be determined
       at trial for economic losses, including but not limited to front pay, back pay, lost benefits,
       liquidated damages, and attorney's fees;

iv.    for the fourth cause of action against Defendants for violation of the ADEA – Retaliation,
       a judgement awarding Plaintiff damages in an amount to be determined at trial for
       economic losses, including but not limited to front pay, back pay, lost benefits, liquidated
       damages, and attorney's fees;

v.      for the fifth cause of action against Defendants for violation of the ADA, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgement interest;

vi.      for the sixth cause of action for violation of the ADA – Hostile Work Environment, a judgment awarding Plaintiff damages in an amount to be determined at trial, including but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgement interest;

vii.      for the seventh cause of action for retaliation under the ADA – Retaliation, a judgment awarding Plaintiff damages in an amount to be determined at trial, including but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgement interest;

viii.      for the eighth cause of action against Defendants for violation of the IHRA, 775 ILCS 5/2-102(A) – Age, a judgment awarding Plaintiff damages in an amount to be determined at trial, for compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest;

ix.      for the nineth cause of action against Defendants for violation of the IHRA, 775 ILCS 5/2-102(A) – Disability, a judgment awarding Plaintiff damages in an amount to be determined at trial, for compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest;

x.      for the tenth cause of action against Defendants for violation of the IHRA 775 ILCS 5/2-102(A) – Hostile Work Environment, a judgment awarding Plaintiff damages in an amount to be determined at trial, for compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest;

xi.     for the eleventh cause of action for violation of the IHRA – Retaliation, a judgment awarding Plaintiff damages in an amount to be determined at trial, for compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest;

xii.    for the twelfth cause of action against Defendants for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial;

xiii.   on the thirteenth cause of action for breach of contract against Defendant Gucci America, Inc., a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest;

xiv.    for the fourteenth cause of action against Defendant Gucci America, Inc., for Unjust Enrichment (in the Alternative), a judgement awarding Plaintiff damages, including payment of her hourly rate for all hours worked, and for payment of the entirety of her earned and agreed-to commissions.

xv.     for the fifteenth cause of action against Defendant Gucci America, Inc., for violation of the FLSA, a judgement awarding Plaintiff damages in an amount to be determined at trial, including actual damages in the form of Plaintiff's unpaid minimum wages; liquidated damages, per the FLSA, of double her actual unpaid minimum wages; attorneys' fees and costs; and such other and further relief as this Court deems appropriate and just.

xvi.    for the sixteenth cause of action against Defendant Gucci America, Inc., for violation of the IMWL (820 ILCS § 105), a judgment awarding Plaintiff her actual damages in the form

of Plaintiff's unpaid minimum wages; treble damages, pursuant to the IMWL in the amount of triple her unpaid minimum wages; statutory interest on the unpaid minimum wages at the rate of 5% per month; reasonable attorneys' fees and costs; and such other relief as this Court deems appropriate and just.

xvii.    for the seventeenth cause of action for violation of the IWPCA – Unpaid Final Compensation/Earned Commissions, judgment for Plaintiff in the amount of her unpaid wages, and earned commissions; statutory damages equivalent to the maximum statutory monthly interest penalties available pursuant to 820 ILCS 115/14; reasonable attorneys' fees and costs as required under 820 ILCS 115/15; and such other and further relief as this Court deems appropriate and just; and

xviii.    such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

**Tamara Holder**
**Attorney for Plaintiff Tracy Cohen**

By: */s/ Tamara Holder*
The Law Firm of Tamara N. Holder, LLC
917 W. Washington Blvd., Ste. 222
Chicago, IL 60607
Phone: 312-440-9000
tamara@tamaraholder.com